# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SHABTAI SCOTT SHATSKY**,
individually and as personal representative
of the Estate of Keren Shatsky
15 HaArava St.
Karnei Shomron, Israel 4485500

**JO ANNE SHATSKY**,
individually and as personal representative              Civil No.
of the Estate of Keren Shatsky
15 HaArava St.
Karnei Shomron, Israel 4485500                           **COMPLAINT**

**TZIPPORA SHATSKY SCHWARZ**                              **Jury Trial Demanded**
49 Yigal Yadin St. Apt.  37
Modiin, Israel 7171608

**YOSEPH SHATSKY**
13 Yafe Nof St.
Karnei Shomron, Israel 4485500

**SARA SHATSKY TZIMMERMAN**
63 Ibey Hanahal St. Apt. 5
Avney Hefets, Israel 4486100

**MIRIAM SHATSKY**
4 Habrosh St. Apt. 4
Karnei Shomron, Israel 4485500

**DAVID RAPHAEL SHATSKY**
27 HaShikma St.
Karnei Shomron, Israel 4485500

**GINETTE LANDO THALER**,
individually, and as personal representative
of the Estate of Rachel Thaler
2 Anna Frank St. Apt. 1
Raanana, Israel

**MICHAEL THALER**,
individually, and as personal representative
of the Estate of Rachel Thaler
2 Anna Frank St., Apt. 1
Raanana, Israel

**LEOR THALER**
2 Anna Frank St., Apt. 1
Raanana, Israel

**ZVI THALER**
2 Anna Frank St., Apt. 1
Raanana, Israel

**ISAAC THALER**
10444 White Pinto Court,
Lake Worth, FL 33449

**HILLEL TRATTNER**
25 HaHayal St.
Bruchin, Israel

**RONIT TRATTNER**
25 HaHayal St.
Bruchin, Israel

**ARON S. TRATTNER**
14 Hagefen
Ginot Shomron, Israel

**SHELLEY TRATTNER**
14 Hagefen
Ginot Shomron, Israel

**EFRAT TRATTNER**
535 Maale Michmas
Israel 9063400

**HADASSA DINER**
602 Maale Michmas
Israel 9063400

**YAEL HILLMAN**
6 Pinchi St.
Petach Tikva, Israel

**STEVEN BRAUN**
15 Hatamar St.
Karnei Shomron, Israel

**CHANA FRIEDMAN**
6 Berenfeld St.
Tel Aviv, Israel

**ILAN FRIEDMAN**
30 Azar Street
Ramat Hasharon, Israel

**MIRIAM FRIEDMAN**
30 Azar Street
Ramat Hasharon, Israel

**YEHIEL FRIEDMAN**
30 Azar Street
Ramat Hasharon, Israel

**ZVI FRIEDMAN**
30 Azar Street
Ramat Hasharon, Israel

and

**BELLA FRIEDMAN**
4 HaRimon St.
Ginot Shomron, Israel

                              Plaintiffs,
          vs.

**THE PALESTINE LIBERATION
ORGANIZATION**
Mukata'a Building
Ramallah, West Bank
via Israel

and

**THE PALESTINIAN AUTHORITY**
(a/k/a "The Palestinian Interim Self-Government
Authority" and/or "The Palestinian National Authority")
Mukata'a Building
Ramallah, West Bank
via Israel

                              Defendants.

Plaintiffs, complaining of the Defendants, by Counsel, allege for their Complaint as follows:

## INTRODUCTION

1.      This is a civil action for international terrorism resulting in murder, personal injury and related harms, pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, and nonfederal causes of action, brought by United States citizens, and by the family members and the personal representatives of the estates of United States citizens, who were killed and injured by a terrorist bombing caused, facilitated and executed by defendants Palestine Liberation Organization and Palestinian Authority, at a pizzeria in the town of Karnei Shomron, in the Samaria region of the West Bank, on February 16, 2002.

## JURISDICTION AND VENUE

2.      This Court may exercise jurisdiction over this matter and over defendants pursuant to 18 U.S.C. §§ 2333 and 2334, and 28 U.S.C. § 1331.

3.      This Court has supplemental jurisdiction over plaintiffs' nonfederal claims under 28 U.S.C. § 1367 because they are related to, and form part of the same case or controversy as, the claims over which this Court has original jurisdiction.

4.      This Court may exercise personal jurisdiction over the defendants in this action under the Antiterrorism Clarification Act of 2018 ("ATCA"), Pub. L. 115-253, and also because the defendants' conduct complained of herein was targeted at the United States.

5.      This Court is a proper venue for this action pursuant to 28 U.S.C. § 1391(c), and also pursuant to 18 U.S.C. §2334(a), since the defendants have agents in this district.

## THE PARTIES

6.      Plaintiffs SHABTAI SCOTT SHATSKY and JO ANNE SHATSKY, at all times relevant hereto are and were American citizens, and the parents, heirs and personal representatives of the estate of Keren Shatsky, a 14-year-old American citizen murdered in a terrorist bombing facilitated, caused and executed by the defendants at a pizzeria in Karnei Shomron, in the Samaria region of the West Bank, on February 16, 2002 (hereinafter: the "Terrorist Bombing"). Plaintiffs SHABTAI SCOTT SHATSKY and JO ANNE SHATSKY bring this action individually and on behalf of the estate of Keren Shatsky.

7.      Plaintiffs TZIPPORA SHATSKY SCHWARZ, YOSEPH SHATSKY, SARA SHATSKY TZIMMERMAN, MIRIAM SHATSKY and DAVID RAPHAEL SHATSKY at all times relevant hereto are and were American citizens and the siblings of decedent Keren Shatsky.

8.      Plaintiffs GINETTE LANDO THALER and MICHAEL THALER at all times relevant hereto are and were the parents, heirs and personal representatives of the estate of Rachel Thaler, a 15-year-old American citizen murdered in the Terrorist Bombing. Plaintiff MICHAEL THALER at all times relevant hereto is and was an American citizen. Plaintiffs GINETTE LANDO THALER and MICHAEL THALER bring this action individually, and on behalf of the estate of Rachel Thaler.

9.      Plaintiffs LEOR THALER, ZVI THALER, and ISAAC THALER at all times relevant hereto are and were American citizens and the siblings of decedent Rachel Thaler.

10.      Plaintiff LEOR THALER suffered severe physical and other injuries in the Terrorist Bombing.

11.     Plaintiff HILLEL TRATTNER suffered severe physical and other injuries in the Terrorist Bombing, and at all times relevant hereto is and was an American citizen.

12.     Plaintiff RONIT TRATTNER suffered severe physical and other injuries in the Terrorist Bombing, and at all times relevant hereto is and was the spouse of plaintiff HILLEL TRATTNER.

13.     Plaintiffs ARON S. TRATTNER and SHELLEY TRATTNER at all times relevant hereto are and were American citizens and the parents of plaintiff HILLEL TRATTNER.

14.     Plaintiffs EFRAT TRATTNER, HADASSA DINER and YAEL HILLMAN at all times relevant hereto are and were American citizens and the sisters of plaintiff HILLEL TRATTNER.

15.     Plaintiff STEVEN BRAUN suffered severe physical and other injuries in the Terrorist Bombing, and at all times relevant hereto is and was an American citizen.

16.     Plaintiff CHANA FRIEDMAN suffered severe physical and other injuries in the Terrorist Bombing, and at all times relevant hereto is and was an American citizen.

17.     Plaintiffs ILAN FRIEDMAN, YEHIEL FRIEDMAN, ZVI FRIEDMAN and MIRIAM FRIEDMAN, at all times relevant hereto are and were American citizens and the siblings of plaintiff CHANA FRIEDMAN.

18.     Plaintiff BELLA FRIEDMAN at all times relevant hereto is and was an American citizen and the mother of plaintiff CHANA FRIEDMAN.

19.     Defendant The Palestine Liberation Organization (hereinafter "PLO") is, and at all times relevant hereto was, a legal person as defined in 18 U.S.C. § 2331. Defendant PLO facilitated, caused and executed the Terrorist Bombing.

6

20.     Defendant The Palestinian Authority, also known as The Palestinian Interim Self Government Authority and/or The Palestinian National Authority (hereinafter "PA"), is and at all times relevant hereto was, a legal person as defined in 18 U.S.C. § 2331. Defendant PA facilitated, caused and executed the Terrorist Bombing. At all relevant times, the PA served as the non-sovereign governing authority for certain areas in the West Bank and the Gaza Strip.

21.     At all times relevant hereto, the PLO and PA have had offices and agents in the United States.

22.     At all times relevant hereto, the PLO and PA have received U.S. foreign assistance under section 481 and chapters 4 and 9 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. § 2346 et seq.).  As of the date of the filing of this complaint, such U.S. assistance continues.

## STATEMENT OF FACTS

23.     Since its establishment in the 1960's, defendant PLO has funded, planned and carried out tens of thousands of terrorist bombings and shootings, resulting in the deaths of thousands of innocent civilians and the wounding of thousands more. Many scores of United States citizens were murdered, and many more wounded, by terrorist attacks carried out by defendant PLO.

24.     Congress explicitly found that "the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens abroad" and that "the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law …".  22 U.S.C. § 5201. At all relevant times, defendant PLO utilized these terrorist attacks as an established and systematic policy and practice to advance and achieve its political goals, including the expulsion of Jews from the West Bank.

25.     The PLO has rarely, if ever, carried out terrorist attacks in its own name. Rather, at all times relevant hereto, the PLO has funded, planned and carried out terrorist attacks through its officials, agents and employees, who are and were organized into various factions, units, cells and groups which plan and execute terrorist attacks on behalf of and for the PLO, and/or as agents and/or as alter egos of the PLO, using various and sundry appellations and *noms de guerre* (collectively hereinafter referred to as PLO "organs").

26.     One of the PLO's terrorist organs is a faction of the PLO known as the "Popular Front for the Liberation of Palestine" ("PFLP"). The PFLP is one of the PLO's "constituent groups" referenced by Congress in 22 U.S.C. § 5201. The PLO and PFLP do not have separate legal personalities: the PFLP is simply a subdivision and/or department of the PLO, all members of the PFLP are per se members of the PLO, and all actions of the PFLP, including the Terrorist Bombing, constitute actions of the PLO.

27.     The PFLP is a radical Marxist-Leninist terrorist faction of the PLO. The PFLP's openly-declared goals include the expulsion of Jews from the West Bank (which goal defendants PLO and PA openly and expressly share), and the destruction of the State of Israel and the murder, expulsion or subjugation of its Jewish residents. The PFLP seeks to achieve this goal by carrying out terrorist attacks against Jewish civilians in Israel, the West Bank, and elsewhere. The PFLP proudly and openly acknowledges that it uses terrorism to achieve its political goals.

28.     The PFLP is also extremely hostile to the United States, which it considers to be predatory, imperialistic, capitalistic, and an ally of Israel.

29.     Between the 1960s and February 2002 (and through the present day), the PFLP carried out hundreds of terrorist attacks, including hijackings of U.S. aircraft, in which scores of Israeli, American, and other civilians were murdered, and hundreds more wounded.

30.     Accordingly, the PFLP was continuously designated by the United States government as a Specially Designated Terrorist ("SDT") since 1995, as a Foreign Terrorist Organization ("FTO") since 1997, and as a Specially Designated Global Terrorist ("SDGT") since 2001.

31.     The provision of funding, or other material support or resources, to an SDT, an FTO, or an SDGT, such as the PFLP, is a crime under numerous provisions of United States law, including the provisions of Chapter 113B of Title 18 of the U.S. Code.

32.     Notwithstanding the PFLP's bloody record of terrorism, including anti-American terrorism, and the grave U.S. criminal prohibitions on providing the PFLP with funds or other material support or resources, the PLO continuously provided the PFLP with many millions of dollars in funding, and other material support and resources, from the 1960s until (and after) February 2002. Between 1994 and until (and after) February 2002, defendant PA also provided the PFLP with funding, and other material support and resources, worth millions of dollars.

33.     Since its establishment in 1994, defendant PA has also funded, planned and carried out thousands of terrorist bombings and shootings, resulting in the deaths of thousands of civilians and the wounding of thousands more. The PA funded, planned and carried out these terrorist attacks through its officials, agents, and employees, including particularly through its so-called "police," "security" and "intelligence" agencies, and through PLO organs including the PFLP. Many United States citizens have been murdered, and many more maimed, by terrorist attacks carried out by defendant PA through its officials, agents, and employees, and through the PLO's organs acting on behalf of and with funding and other assistance from the PA. At all relevant times, defendant PA utilized these terrorist attacks as an established and systematic policy and practice to advance and achieve its political goals, including the expulsion of Jews from the West Bank.

34.     In 2000 the defendants launched an intensive terrorist campaign known as the "al-Aqsa Intifada" or the "Second Intifada." During this period (and even prior) defendants recruited notorious terrorists, including PFLP terrorists, into the PA's "police," "security" and "intelligence" agencies, armed them, and put them on their payroll. Defendants released known terrorists from their jails. Through their official publications, television stations, and newspapers that they controlled, defendants directed the members of the PA's own police, security and intelligence agencies, and the PLO's organs including the PFLP, to commit acts of terrorist violence against Jews and Israelis. They provided weapons, funding, safe houses, personnel, and other resources and support to terrorists and terrorist organizations, including the PFLP. They glorified and rewarded the perpetrators of violence with money, promotions, state-sponsored funerals, and media accolades. Officers and employees of PA "police," "security" and "intelligence" agencies imprisoned for terrorist attacks by Israel remained on defendants' payrolls, collecting generous salaries and promotions in rank while defendants publicly lionized them as national heroes. Non-employees (including non-Palestinians) imprisoned by Israel for terrorism were also rewarded by defendants PLO and PA with monthly "salaries" during their incarceration. Defendants also paid the families of terrorists killed in terrorist attacks (so-called "martyrs") both as a reward for their attacks and as a financial safety net for the terrorists' families, aimed at inducing and encouraging more such attacks. Defendants incited, induced, directed, supported, orchestrated, executed, and then ratified the Terrorist Bombing, as part of their "Intifada" terrorist campaign.

35.     The purpose of this "Intifada" terror campaign was to intimidate and coerce the civilian population of Israel, to influence the policy of the U.S. and Israeli governments by intimidation and coercion, and to affect the conduct of the U.S. and Israeli governments by mass destruction. Specifically, defendants carried out this campaign of terrorism with the goal of ending

the Israeli Jewish presence in the West Bank and Gaza Strip. It was a classic protection racket: defendants caused and carried out terrorist attacks resulting in the deaths and maiming of thousands of civilians, disingenuously condemned that violence, and then announced that the violence would end only if Israel withdrew from territory defendants demanded.

36.     At all relevant times, defendants were alter egos of one another, acted in complete unison, and were controlled by one man—Yasser Arafat. Arafat was the Chairman of the PLO from 1969 until his death in 2004, and the President of the PA from 1994 to 2004.

37.     Arafat controlled the day-to-day operations and the budgets of both defendants, and controlled their activities. Arafat personally controlled the spending and operations of the PLO and PA. He controlled personnel decisions in both the PLO and PA.

38.     Through media outlets owned and controlled by the PLO and PA, and through speeches by PA and PLO officials, defendants directed, authorized, and incited terrorist violence against Jews and Israelis. Most important and horrific were magazines published for PA "police," "security" and "intelligence" agencies—published by the PA, edited and authored in many cases by the PA's and the PLO's so-called "Political Guidance" apparatus, and distributed to PA security, police and intelligence personnel. This "Political Guidance" apparatus had representatives in all such PA agencies; its job being to "educate" PA personnel by delegitimizing the existence of the State of Israel and inciting them to hatred against Jews and Israelis, and to thereby encourage terrorist attacks on Jews and Israelis by PA personnel.

39.     Furthermore, PA TV—which defendants owned and controlled—broadcast programs in which children expressed their wish to engage in "*shahada*" (suicide martyrdom) because *shahada* was "beautiful."  Moreover, PLO and PA leader Arafat appeared in public with his machine gun and made public speeches encouraging violence—including a notorious one to a

group of children in which he glorified a child who committed suicide and then led the children in

a chant of "a million martyrs marching to Jerusalem." Programming on PA TV encouraged viewers

to "Kill the Jews, and the Americans who are just like them."

40.     As a result of defendants' pro-terror activities and policies during the Intifada,

hundreds of the PA's security, police and intelligence employees are in prison in Israel, after

having executed terrorist crimes during that period at defendants' behest—as defendants' own

officials and websites proudly confirm. Many other such PA officials and employees were killed

while carrying out terrorist attacks at defendants' behest.

41.     During the period relevant hereto, the President of the United States, the U.S. State

Department, special U.S. envoys, the Congress of the United States and others repeatedly

demanded from the PA and PLO that they halt terrorist attacks by their employees and agents, and

by PLO organs and other terrorist groups operating from PA-governed territory.

42.     The PLO and PA refused and/or ignored these American demands. On the contrary,

at all relevant times, defendants PLO and PA, by and through their officials, employees and agents

acting within the scope and course of their employment and agency, pursuant to authorization and

instructions of Arafat and others agents and employees of the PLO and PA, provided the PFLP

and other terrorists with material support and resources in the form of weapons, personnel, safe

harbor, training, funding, communications equipment and other material support for their terrorist

activities and further provided the PFLP and other terrorists with safe haven and a base of

operations, by permitting and encouraging the PFLP and other terror groups to operate freely and

conduct activities in the territory governed by the PA, and to advocate, encourage, solicit, facilitate,

incite for, sponsor, organize, plan and execute acts of violence, murder and terrorism against

innocent civilians in Israel and the West Bank, including in locations known to be frequented by

Americans. Moreover, at all relevant times, the defendants funded the PFLP's many headquarters and offices within the territory governed by the PA.

43.     Contemporaneously with their "Intifada" terror campaign in Israel, the West Bank and the Gaza Strip, the PLO and PA launched an extensive influence campaign to use that terror campaign to manipulate the U.S. government into pressuring the Israeli government into accommodating the PA's and PLO's political goals. This influence campaign was expressly directed at the society and government of the United States. For example, between 2000 and 2002, Hassan Abdel Rahman, the Chief Representative of the PLO and PA in the U.S. at the time, repeatedly argued to U.S. leaders and the American public that the only way the terrorist attacks against Jewish and Israeli targets would end was if the U.S. pressured Israel to withdraw from the West Bank. A small sampling of Abdel Rahman's statements demonstrates the linkage made between the terrorist attacks and the demand for a change in U.S. policy. He appeared on CNN on April 12, 2002 and stated that the Israeli Jewish presence in the West Bank constituted "one of the most brutal occupations in modern history. That's what turns people into suicide bombers." He appeared on PBS, on March 29, 2002 and stated: "Mr. Colin Powell is missing the point . . . He should point fingers to Mr. Sharon to move his soldiers, his army, his settlers, from the Palestinian territories . . . if the occupation continues . . . no one can stop the Palestinians."

44.     Abdel Rahman made other appearances on national TV in the U.S.: on CNN on February 3, 2002 – less than two weeks before the Terrorist Bombing – he demanded and ominously threatened: "[t]he Jewish settlements . . . have to be removed in order for us to be able to establish the kind of peace that we want to establish with Israel."); and on CNN, on April 14, 2002, he stated: "I think the involvement of the United States on the site would be very, very

helpful because obviously the two parties trust the United States and they want the United States to be involved . . . We feel that 35 years of foreign, illegal occupation is more than enough."

45.     Similarly, top PLO leader Marwan Barghouti published an op-ed piece in the *Washington Post* in January 2002 entitled "Want Security?  End the Occupation."  This was at the very same time that Mr. Barghouti himself was orchestrating multiple terror attacks in Israel.

46.     The PLO and PA caused and executed acts of terrorism which killed and injured many Americans, including the plaintiffs here and their decedents, all the while pressuring the U.S. government, under false pretenses, to act on their behalf. The PLO and PA attempt to influence the United States depended on continued terror attacks in Israel, the West Bank, and Gaza, which were being orchestrated by defendants at the same time. Defendants' U.S.-media campaign, directed to the society and government of the United States, formed an element of their liability-creating conduct because, inter alia, that campaign manifested defendants' apparent and actual intent to influence the government and policy of the United States through acts of violence.

## THE TERRORIST BOMBING

47.     On Saturday evening, February 16, 2002, fourteen-year-old Keren Shatsky and fifteen-year-old Rachel Thaler went for pizza at a busy pizzeria located at an outdoor shopping mall in Karnei Shomron, a West Bank town just 14 miles from Qalqilya, an area governed by the PA. Hundreds of American citizens live, work and shop daily in Karnei Shomron.

48.     Rachel's teenage brother, Leor, and a friend, Chana Friedman, joined them. Others dining that evening included plaintiffs, Hillel Trattner and his wife, Ronit, and Steven Braun.

49.     At approximately 7:55 p.m., Sadeq Abdel Hafez, a PFLP operative, arrived at the pizzeria, walked to the table where Rachel Thaler, Leor Thaler, and Chana Friedman sat chatting amiably in English, and detonated the explosive device he was carrying.

50.     Keren Shatsky died at the scene. Rachel Thaler, left severely injured and suffering, lived for another 11 days before dying, and the others survived but with severe injuries.

51.     The mastermind of the bombing was Ra'ed Nazal ("Nazal"), who was both a Captain in the PA's National Security force and the leader of the PFLP in Qalqilya.

52.     Nazal was imprisoned by Israel for his PFLP-related activities in 1985. In prison, Nazal continued actively recruiting young people into the PFLP, and tortured to death a fellow Palestinian prisoner whom he suspected of cooperating with Israel against terrorism.

53.     The PLO and PA successfully demanded Nazal's early release from prison in September 1999, as part of negotiations with Israel. The PLO and PA sought Nazal's release because of his history of and dedication to deadly anti-Israel violence.

54.     Additionally, because of Nazal's history of and dedication to murderous anti-Israel terrorist activity, upon his release Nazal was hired by the PA as an officer with the rank of Captain in the PA's National Security force in Qalqilya, with commensurate salary.

55.     Simultaneous with his employment by the PA, immediately upon release from prison, Nazal assumed a leadership role in the PFLP's cell in Qalqilya and its environs. He was elected General Secretary of the PFLP for the Qalqilya Governorate in December 1999.

56.     The PA paid Nazal a regular monthly salary for his position as a Captain in PA National Security, but assigned him no duties or responsibilities, in order to enable him to serve full-time as the PFLP commander in the Qalqilya region. Also, during this time, the PFLP headquarters in Qalqilya was funded by the PA.

57.     While employed and paid by the PA, and with the full, real-time knowledge of the defendants, Nazal perpetrated terrorist activities on behalf of the PFLP, and recruited Palestinian

youth to the PFLP. One such recruit was Sadeq Abdel Hafez, the PFLP operative who committed the February 16, 2002, Karnei Shomron bombing.

58.     Within months of Nazal's prison release in 1999, another PFLP member introduced the then-16-year-old Sadeq Abdel Hafez to Nazal. Two years later, under the command of PA "security" Captain and PFLP leader Nazal, Hafez detonated the bomb in the Karnei Shomron pizzeria, and died in the explosion. It was Nazal and the PFLP, with the aid, financial support and approval of the PLO and the PA, who planned, initiated and caused the Karnei Shomron bombing.

59.     Nazal died two months after the Karnei Shomron bombing in a stand-off with Israeli forces who were pursuing him in connection with his role in the Karnei Shomron attack. As a reward for and as an endorsement of Nazal's role in the bombing, the PA posthumously promoted Nazal from Captain in the PA National Security apparatus to the rank of Major, and the defendants began regularly making "martyr" payments to Nazal's family.

60.     Sadeq Abdel Hafez's family also received "martyr" payments from the defendants as a reward for and endorsement of Hafez's role in the bombing.

61.     The PFLP, in conspiracy with and materially supported by the defendants, committed, planned, and authorized the Terrorist Bombing. Hafez was a PFLP operative, at all relevant times acting at the behest, instruction, and authorization both of the PFLP and of Nazal in his capacity as an employee and officer of the PA.

62.     The Terrorist Bombing was planned and carried out by Nazal, Hafez and others acting as defendants' agents and employees and within the scope of their agency and employment, pursuant to defendants' prior authorization, instructions, solicitation and directives, in furtherance of defendants' goals and policies, and using personnel, funds, and other material support and

resources that defendants supplied them, for the express purpose of carrying out this attack and terrorist attacks of this type.

63.     Defendants agreed, conspired and acted in concert with the PFLP, Nazal, Hafez and others to carry out the Terrorist Bombing, knowingly provided substantial assistance to them, aided and abetted them to carry out the bombing, and authorized, ratified and participated the bombing.

**FIRST CLAIM FOR RELIEF**
**AGAINST BOTH DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
**ACTION FOR INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)**

64.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

65.     The acts of defendants PLO and PA constituted a violation of the criminal laws of the United States and of the several States, and/or would constitute criminal violations if committed within the jurisdiction of the United States and of the several States. The actions of the PLO and the PA violate, or if committed within U.S. jurisdiction would violate, literally scores of federal and state criminal statutes prohibiting, *inter alia* and without limitation: the provision of material support to FTOs, SDTs and SDGTs and/or for terrorist activities (18 U.S.C. §§ 2339A and 2339B); homicide; battery; assault; and the construction and use of explosive devices; as well as the criminal prohibitions against aiding and abetting, serving as an accessory to, solicitation of, and conspiracy to commit, these and other such felonies.

66.     Defendants' actions described herein were carried out pursuant to, and as implementation of, an established policy of utilizing terrorist attacks to achieve their goals. Specifically, defendants' acts appeared and were in fact intended to terrorize, intimidate and coerce the civilian population in Israel by intimidation or coercion into acquiescing to defendants' political goals and demands. These acts also appeared and were in fact intended to influence the

policy of the U.S. and Israeli governments by intimidation or coercion, and to affect the conduct of the U.S. and Israeli governments by mass destruction in order to induce those governments into accepting defendants' political goals and demands. Moreover, defendants, themselves and through their respective officials, representatives, spokesmen, communications media and other agents: (1) repeatedly admitted to committing acts of terrorism and violence against the civilian population in Israel and the West Bank, (2) expressly stated that these acts were intended to intimidate and coerce that civilian population into acquiescing to defendants' political goals and demands and to influence the policy of the United States and Israeli governments by intimidation or coercion in favor of defendants' political goals and demands, and (3) expressly threatened the further occurrence of such terrorist acts if their political goals and demands were not achieved. Many such statements were made inside the United States and/or were directed to or at the U.S. government.

67.     The acts of defendants PLO and PA described herein therefore appear to be and were in fact intended to intimidate and coerce a civilian population, and to influence the policy of a government by intimidation or coercion, within the meaning of 18 U.S.C. § 2331.

68.     The acts of defendants PLO and PA were violent, and were dangerous to human life, by their nature and as evidenced by their consequences.

69.     The acts of defendants PLO and PA occurred outside the territorial jurisdiction of the United States.

70.     The actions of defendants PLO and PA are therefore "acts of international terrorism" as defined under 18 U.S.C. §§ 2331 and 2333.

71.     As a direct and proximate result of the acts of international terrorism committed by defendants PLO and PA, including the Terrorist Bombing, the decedents were murdered and the plaintiffs suffered severe injuries and harm.

72.     Decedent Keren Shatsky was murdered in the Terrorist Bombing. The murder of Keren Shatsky caused decedent, her estate and plaintiffs SHABTAI SCOTT SHATSKY, JO ANNE SHATSKY, TZIPPORA SHATSKY SCHWARZ, YOSEPH SHATSKY, SARA SHATSKY TZIMMERMAN, MIRIAM SHATSKY and DAVID RAPHAEL SHATSKY severe injury, including: death; pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solarium.

73.     Decedent Rachel Thaler was murdered in the Terrorist Bombing. The murder of Rachel Thaler caused decedent, her estate and plaintiffs GINETTE LANDO THALER, MICHAEL THALER, LEOR THALER, ZVI THALER and ISAAC THALER severe injury, including: death; pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

74.     Plaintiffs LEOR THALER, HILLEL TRATTNER, RONIT TRATTNER, STEVEN BRAUN and CHANA FRIEDMAN suffered severe physical, psychological and other injuries as a result of the Terrorist Bombing, including: burns, disfigurement, blindness, loss of physical and mental functions and shrapnel wounds; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and pecuniary loss and loss of income.

75.     The injuries suffered by plaintiffs LEOR THALER, HILLEL TRATTNER, RONIT TRATTNER, STEVEN BRAUN and CHANA FRIEDMAN in the Terrorist Bombing caused them and plaintiffs GINETTE LANDO THALER, MICHAEL THALER, ZVI THALER, ISAAC THALER, ARON S. TRATTNER, SHELLEY TRATTNER, EFRAT TRATTNER, HADASSA

DINER, YAEL HILLMAN, BELLA FRIEDMAN, ILAN FRIEDMAN, MIRIAM FRIEDMAN, YEHIEL FRIEDMAN and ZVI FRIEDMAN severe harm, including: loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and pecuniary loss and loss of income.

76.     Defendants are therefore jointly and severally liable for all of plaintiffs' damages, in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333.

77.     Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large warranting an award of punitive damages.

**SECOND CLAIM FOR RELIEF**
**AGAINST BOTH DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
**AIDING AND ABETTING AND CONSPIRACY PURSUANT TO 18 U.S.C. § 2333(d)**

78.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

79.     The Terrorist Bombing constituted a violation of the criminal laws of the United States, and was violent and dangerous to human life. The Terrorist Bombing occurred outside the territorial jurisdiction of the United States, and appeared and was in fact intended to influence the civilian population in Israel by intimidation or coercion into acquiescing in the shared political goals and demands of the defendants and the PFLP. The Terrorist Bombing also appeared and was in fact intended to influence the policy of the U.S. and Israeli governments by intimidation or coercion, and to affect the conduct of the U.S. and Israeli governments by mass destruction in order to induce those governments into accepting the shared political goals and demands of the defendants and the PFLP.

80.     Therefore, the Terrorist Bombing constituted an "act of international terrorism" as defined in 18 U.S.C. § 2331.

81.     The PFLP committed, planned, and authorized the Terrorist Bombing.

82.     The PFLP was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which it committed, planned, and authorized the Terrorist Bombing.

83.     The PFLP is a "person" within the meaning of 18 U.S.C. § 2333(d)(1).

84.     Nazal and Hafez committed the Terrorist Bombing.

85.     Nazal and Hafez are each a "person" within the meaning of 18 U.S.C. § 2333(d)(1).

86.     Defendants knowingly aided and abetted the PFLP, Nazal and Hafez to commit the Terrorist Bombing, by providing them with substantial assistance which they knew and intended would enable, facilitate, support and assist them to carry out terrorist attacks such as the Terrorist Bombing.

87.     Defendants also engaged in an extensive, long-term criminal scheme with the PFLP and Nazal, involving the funding, promotion and use of terrorism to achieve their shared goal of removing all Jews from the West Bank. Pursuant to and in furtherance of that common scheme with the defendants, the PFLP and Nazal carried out the Terrorist Bombing.

88.     Defendants are therefore jointly and severally liable, as aiders and abettors and as co-conspirators, for all of the damages due to the plaintiffs, in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

89.     Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large warranting an award of punitive damages.

## THIRD CLAIM FOR RELIEF
## AGAINST BOTH DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
## NEGLIGENCE
### (Under the Law of the State of Israel)

90.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

91.     Causes of action in tort in Israeli law are codified in the Civil Wrongs Ordinance (New Version) - 1968 ("CWO"). The CWO provides that any person injured or harmed by the torts enumerated in the CWO is entitled to relief from the person liable or responsible for the tort.

92.     Section 35 of the Israeli CWO creates a tort of Negligence.

93.     CWO § 35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances, he is obligated not to act as he did.

94.     CWO § 36 provides that the obligation stated in CWO §35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

95.     The Israeli courts have construed the tort of Negligence to include intentional and/or reckless conduct.

96.     Defendants committed acts which a reasonable and prudent person would not have committed under the same circumstances, and refrained from committing acts which a

reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO.

97.     Defendants did not, in the performance of their occupations, use the skill or exercise the degree of caution which a reasonable person qualified to act in those occupations would have used or exercised under the same circumstances, within the meaning of the CWO.

98.     Defendants acted negligently in connection with the plaintiffs and their decedents, toward whom, in the circumstances described herein, defendants had an obligation not to act as they did. Defendants were obligated not to act as they did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, the plaintiffs and their decedents were liable to be injured by defendants' acts described herein.

99.     Defendants' behavior therefore constitutes Negligence under the CWO, and as a result of the defendants' negligent behavior the Terrorist Bombing was carried out, the decedents were murdered and they and the plaintiffs suffered severe injuries and harm.

100.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

101.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large warranting an award of punitive damages.

**FOURTH CLAIM FOR RELIEF**
**AGAINST BOTH DEFENDANTS**
**ON BEHALF OF PLAINTIFFS MICHAEL THALER AND ISAAC THALER**
**<u>INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>**
**(Under the Law of the State of Florida)**

102.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

103.    Defendants' conduct was willful and malicious, and/or grossly negligent, and was outrageous, and dangerous to human life, and violated applicable criminal law, all international standards of civilized human conduct, and common decency.

104.    Defendants' conduct terrorized plaintiffs MICHAEL THALER and ISAAC THALER, who were domiciliaries of the State of Florida at the time of the Terrorist Bombing, and caused them egregious emotional distress.

105.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs MICHAEL THALER's and ISAAC THALER's damages, in such sums as may hereinafter be determined.

106.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large warranting an award of punitive damages.

## FIFTH CLAIM FOR RELIEF
## AGAINST BOTH DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
## CIVIL CONSPIRACY
### (Under the Law of the State of Israel and the State of Florida)

107.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

108.    Defendants knowingly and willingly conspired, agreed and acted in concert with each other and with the PFLP, Nazal and Hafez, in a common plan and design to facilitate and cause acts of international terrorism, including the Terrorist Bombing.

109.    As a result of the Terrorist Bombing caused, resulting from and facilitated by defendants' conspiracy with the PFLP, Nazal and Hafez, the decedents were murdered and the plaintiffs suffered severe damages.

110.    The claims of plaintiffs MICHAEL THALER and ISAAC THALER under this Claim for Relief are governed by civil conspiracy principles under Florida law. The claims of all the other plaintiffs under this Claim for Relief are governed by civil conspiracy principles under Israeli law.

111.    Civil conspiracy principles are recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

112.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

## SIXTH CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
### AIDING AND ABETTING
### (Under the Law of the State of Israel and the State of Florida)

113.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

114.    Defendants provided the PFLP and Nazal with substantial material support and resources, and aid and assistance, in order to aid, abet, facilitate and cause the commission of acts of international terrorism, including the Terrorist Bombing.

115.    As a result of the Terrorist Bombing caused, resulting from and facilitated by defendants' provision of material support and resources and other acts of aiding and abetting, decedents were murdered and plaintiffs suffered severe damages.

116.    The claims of plaintiffs MICHAEL THALER and ISAAC THALER under this Claim for Relief are governed by aiding and abetting principles under Florida law. The claims of

all the other plaintiffs under this Claim for Relief are governed by aiding and abetting principles recognized under Israeli law.

117.    Aiding and abetting principles are recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or  omission.

118.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

## SEVENTH CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
### VICARIOUS LIABILITY/RESPONDEAT SUPERIOR
**(Under the Law of the State of Israel and the State of Florida)**

119.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

120.    At all relevant times, Nazal was an agent, officer and employee of defendants acting within the scope of his agency, office and employment. Nazal engaged in the actions described herein within the scope of his agency, office and employment and in furtherance of the interests of the defendants.

121.    At all relevant times, the PFLP and Hafez were agents of the defendants acting within the scope of their agency. The PFLP and Hafez engaged in the actions described herein within the scope of their agency, in furtherance of the interests of the defendants.

122.    Defendants authorized, ratified and condoned the actions described herein of the PFLP, Nazal and Hafez.

123.    Therefore, defendants are vicariously liable for the acts of the PFLP, Nazal and Hafez.

124.    The claims of plaintiffs MICHAEL THALER and ISAAC THALER under this Claim for Relief are governed by respondeat superior and vicarious liability principles recognized under Florida law. The claims of all the other plaintiffs under this Claim for Relief are governed by respondeat superior and vicarious liability principles recognized under Israeli law.

125.    Respondeat superior and vicarious liability principles are recognized in the CWO. CWO § 13 provides that an employer is liable for an act committed by his employee, if the employer authorized or ratified the act, or if the employee committed the act in the course of his employment. CWO § 14 provides that a person who employs an agent for the performance of an act or a category of acts is liable for everything the agent does in the performance of that act or category of acts, and for the manner in which the agent performs them.

126.    Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

**WHEREFORE,** plaintiffs demand judgment against the defendants jointly and severally, as to each of the above claims for relief and causes of action, as follows:

a.      Compensatory damages against both defendants, jointly and severally, in the amount of $350,000,000.00 (THREE HUNDRED FIFTY MILLION DOLLARS);

b.      Treble damages pursuant to 18 U.S.C. § 2333;

c.      Punitive damages against both defendants, jointly and severally, in the amount of $1,000,000,000.00 (ONE BILLION DOLLARS);

d.      Costs and expenses;

e.      Attorneys' fees;

f.      Such further relief as the Court finds just and equitable.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL MATTERS SO TRIABLE**

Dated:   Brooklyn, New York
           December 30, 2018

Yours,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for the Plaintiffs*

by: _____
      Robert J. Tolchin

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627